Barton *v.* Long.

ISAAC BARTON, appellant,

*v.*

JAMES LONG et al., respondents.

1. In 1857 A and B exchanged lands, and their respective deeds were executed therefor. In 1888 A filed a bill to have the exchange set aside, merely alleging fraud, in that no such land as that conveyed by B existed.—*Held,* that an amendment of the bill, so as to allege fraudulent representations by B, must be refused, on the ground of laches, because A's own testimony shows that he learned of the alleged fraudulent representations ten .years before he filed his bill.

2. The record in a suit between a third party and the United States is inadmissible as evidence against B, in a suit between A and B, without showing the privity of B thereto.

3. In a written agreement for the exchange of lands, B agreed that his conveyance should "be of undoubted title and clear of all tax and encumbrance *to the best of my knowledge and belief."—Held,* that the italicized clause applied as well to the title as to the tax and encumbrance, and qualified both.

4. An act of Congress, passed in 1860, for the settlement of private land claims in the Territories, and embracing the premises in dispute, was constructive notice to the complainant, and bound him (although he swears that he had no actual notice thereof until some ten years afterwards) to avail himself promptly of its provisions for quieting his title, especially as the litigated exchange seems to have been of lands of a speculative character.

On appeal from four orders and from a decree dismissing the bill, advised by Vice-Chancellor Bird, who filed the following opinions:

*First. Opinion on the motion to amend the bill:*

The complainant in this case files his bill to set aside certain conveyances, which were executed and delivered in the year 1857. An answer was filed thereto, and, after the complainant had been put upon terms by the court, as to the time for the production of his testimony, he undertook to show that fraudulent representations had been made by the defendant Long to him at the time of the exchange of the properties. That testimony was ob-

jected to, and there was an appeal taken from the decision of the master, and the court held the testimony was not admissible under the pleadings, there being simply an allegation of fraud, without fact or circumstance showing the nature of the fraud.

The complainant then moved to amend his bill so as to conform to the views of the court, and proposed to add to his bill these words:

"And your orators further say that, both at the time of the making of the said agreement of your orator with the said James Long, and at the time the said James Long presented his two deeds of the said lands to your orator, and your orator accepted the same, the said James Long fraudulently represented to your orator that he was seized in fee of said land and had given perfect title thereto, clear of all encumbrances,"

together with other additions which, I think, are not material to the present discussion. This proposed amendment is resisted by the defendants, Long and McCullough, Long having conveyed his interest in said lands in this State to McCullough.

The resistance is placed chiefly upon the ground that, at this stage of the proceedings, replication having been filed, and issue joined, and testimony having been begun, and the time fixed by the court for the complainant to close his testimony, in the first instance, having passed, although that time had been extended, it is beyond the power of the court, even in the exercise of the discretion which is liberally exercised in New Jersey, to grant the prayer of the complainant to amend his bill. The case of *Codington* v. *Mott, 1 McCart. 430,* was referred to and relied upon by the counsel for the defendants as covering the ground of his objection. It will be noticed, however, in that case, that the proposed amendment went to the very root of the controversy, and changed the whole framework of the bill. The bill had been filed as a bill for the specific performance of a contract. The motion for the amendment was to the effect that there was no binding contract existing between the parties, because it had been fraudulently entered into. The language of the court in that case will bear repetition. " The motion must be denied. Amendments are made in equity with great liberality. They are, in fact, made at every stage of the proceedings wherever the substantial

Barton *v.* Long.

ends of justice will be thereby promoted. But the indulgence has its limitations, although, from the very nature of the case, it is difficult to fix the precise line beyond which the court, in the exercise of its discretion, will not go. Any imperfection in the frame of the bill may thus be remedied as often as occasion shall require. Thus, to enable the court to do complete justice, new matter, existing at the time of filing the bill, may be inserted, new parties added, irrelevant matter stricken out and unnecessary parties omitted."

In my judgment, that case is radically different from the case which is presented now by the proposed amendment.

In *Chambers* v. *Tulane, 1 Stock. 146, 152,* the chancellor permitted an amendment to be made to the bill of complaint, which seems, in many respects, to be as radical in its effects as the offer of the complainant in this case, at the hearing.

In *Davison* v. *Davison, 2 Beas. 246, 252,* the chancellor said : " The contract is not proved precisely as laid in the complainant's bill. The complainant charges that, by the agreement, he was to receive, not only the real estate, but also the personal estate of his father, upon making certain advances to his daughters. The evidence, so far as the personal estate is concerned, does not prove this contract. The bill must be amended so as to conform to the contract as proved. It may be done at this stage of the cause, after hearing on bill, answer and evidence."

In the case of *Wilson* v. *Brown, 2 Beas. 277, 280,* the chancellor expressed himself in similar terms, and, I think, to the like effect. Also, in the case of *Lokerson* v. *Stillwell, 2 Beas. 357,* the amendment which was allowed is to the same effect.

I only advert to these authorities for the purpose of showing the liberality, not only of the court in granting amendments, but of such complete changes as to the parties and as to facts as to bring the very issue that is thus made by the new pleadings and by the proof, to a final determination upon such proof, and in a legal form. The pleadings must be complete for two purposes: First, that each party may be informed of what is charged against him ; and, second, that the foundation may be thus laid for a judgment or decree. The general rule will therefore admit

the proposed amendment, even at this time, were it not for what I next refer to.

But there is another element in this case as to which I feel called upon to speak. It is not the period of time at which the proposed amendment comes in, for, as these cases show, that may be done at the final hearing. I have, on several occasions, in very important suits, allowed the pleadings to be amended at the final hearing, so that the issue between the parties might be disposed of by the judgment of the court resting upon proper allegations. But there appears in this case a fact which the court cannot, in justice to itself, to the parties and to the administration of the public business, ignore. I allude to the laches of the complainant. This conveyance was made in 1857. In the bill of complaint, and in the allegation of counsel in the argument of this cause, it is set up and insisted, that no such land, as is described in this bill of complaint, had any existence at that time.

Now, I apprehend, there is not a case to be found, in the judicial records of any court, that would sustain the complainant in filing a bill, almost thirty years afterwards, to set aside a sham conveyance of this kind, without showing in his bill, clearly and distinctly, particular reasons for the delay. Nothing of that kind appears in this bill. But if that could be overcome by any process of reasoning, or by any other fact in the case, there is an affirmation in the testimony by the complainant himself, that some ten years ago he first learned of the imperfection of this pretended title.

This court is not bound by the statute of limitations. Suppose it was only five years; it is still one of those cases where the court would hold the complainant to the utmost strictness. Suppose this bill had been framed in accordance with my views, and the proofs were all in on both sides, and it appeared that in 1880 the complainant learned of this fact (the fraud as now charged), and that he then knew that Mr. Long had sold to Mr. McCullough, and that he still waited, and waited until the parties—Mr. Long himself if you please, and not McCullough, who is said to be a stranger—but Mr. Long, himself, had made

improvements upon this property to a considerable extent, as is now admitted to be the case. I very strongly believe that there is not a case to be found which would not hold him guilty of laches. I think that, whatever other proof may be offered, the case must be decided against him on that score. It is on this ground that I have held this case under consideration, that I might not be wrong in that particular. See *Badger* v. *Badger,. 2 Wall. 87, 94, 95; Harwood* v. *Railroad Co., 17 Wall. 78; Marsh* v. *Whitmore, 21 Wall. 178; Hance* v. *Conover, 4 Stew. Eq. 505; Paulison* v. *Van Iderstine, 2 Stew. Eq. 594.*

I am always disposed, it may be too liberally disposed, to see that parties have a fair and full hearing, and that a party does not suffer because his counsel has misconceived his rights, or the extent of them, in the beginning of a cause, but with a strong inclination, I might say desire, to allow this amendment, I find this fact of laches so prominently in the case that, it seems to me, as a public servant, I should be doing a very great wrong to allow the complainant to amend his bill, and, therefore, the amendment will be denied, with costs.

*Second. Opinion as to the admission in evidence of the record of the case of* Scull *v.* United States:

After a careful examination of the point made in the offer of the judgment in case of *Scull* v. *United States,* I am obliged to say, that I can see nothing for the offer to rest on. Nothing is shown to connect Long or McCullough with that case, in the most remote relation, so as to bind either. It does not appear that either one was, in any sense, privy to either plaintiff or defendant in the suit named. As the case now stands, the simple fact that the United States was a party gives no force to the judgment over any other. Long or any other person may be in privity to the government of his country as well as to an individual, but that fact must appear as well in the one case as in the other before courts can act thereon. The fact that there is a government, does not raise the presumption that all its citizens, or subjects, are in privity thereto as to all titles in every suit.

*Whitney* v. *Higgins, 10 Cal. 547 (70 Am. Dec. 748)*; see *Freem. Judg.* §§ *166, 190.*

The master is sustained, with costs.

*Third. Opinion on the final hearing dismissing the bill:*

Although I have not had time to write out what I desired to say in this cause, it is due to both parties, and especially to the complainant, not to delay the matter longer than possible, and I therefore take this first opportunity, after giving the matter some reflection, to express what seems to me to be the fundamental principles controlling the case as it now stands.

On June 4th, 1857, Mr. Barton and Mr. Long entered into an agreement respecting the exchange of certain real estate— lands at that time claimed to be owned by Mr. Long in the State of Arkansas for certain lands owned by Mr. Barton on the Atlantic coast, in the State of New Jersey. On the part of Mr. Long, in the written agreement, signed on the 4th day of June, 1857, he stated: " Said conveyance to be of undoubted title and clear of all tax &c., and encumbrance to the best of my knowledge and belief;" while Mr. Barton, upon his part, said that he would convey the two hundred and fourteen acres, title to be undoubted and clear of all encumbrance, tax &c., &c., showing that they both intended the same thing by the use of the same language, and showing, in addition to that, that Mr. Long intended some qualification upon his words, because he added, " to the best of my knowledge and belief." I am aware that it is insisted, upon the part of the complainant, that this qualifying phrase did not include the whole of the previous sentence—that those words only applied to the latter part. Then, the inquiry is, was it intended to apply to the " &c., &c.," or to the " tax," or to the tax and title both?

In my judgment, there being no separation of the words by commas, or otherwise, it is not within the province of the court to supply them, or to attempt to make it read differently from what the sentence reads as presented by the parties, and if it be read as one connected sentence, then that qualification, coming at the conclusion, must have the same force and effect upon the

whole sentence as though it stood at the commencement of the sentence itself, and he had said : "To the best of my knowledge and belief, of undoubted title and clear of all tax &c."

If he had, in such case, conveyed a small tract of land of undoubted title, yet encumbered with tax or other liens, it could not have been said for one moment that, because the qualifying phrase preceded the words "undoubted title," therefore it did not apply to the question of tax as well as to that of title.

I think that the interpretation of the agreement, taking into consideration what both parties said, the language they both used, and the qualifying phrase, which means to qualify something, that Mr. Long said—I say, taking the agreement, Mr. Long did not bind himself, beyond peradventure, to convey any given tract of land of undoubted title, but that phrase, "undoubted title," must be subject to the modifying phrase, "to the best of my knowledge and belief."

Another point in the case is of great importance, I think. These conveyances, upon the part of Mr. Long to Mr. Barton, purported to give title to the undivided half of over eleven thousand acres, as I read it, in the one tract, and over eight thousand acres in the other tract. And what is especially significant, in a fair consideration of the rights of these parties, are the declarations and recitals in each deed, each deed tracing the title through Wilson, who took, in 1841, one forty-second through Case, who took several years prior, referring to their deeds and the place of record back to Don Joseph Valliere, who took directly from the government of Spain, through the governor of the Province of Louisiana, giving the date of the respective conveyances, their place of record in the Spanish archives, and their place of deposit in the city of New Orleans, which facts placed the whole case, and all the means of complete information, within the reach, and, indeed, in the actual possession, of the grantee, Mr. Barton.

It is to be noted that these conveyances were executed, and, I suppose, delivered, within eleven days after the execution of the articles of agreement between the parties, which I have alluded to, and which bears date the 15th day of June, 1857. The

counsel for the complainant has called my attention to an act of Congress, which provides for the settlement of private land claims in the Territories, which act embraces the lands in question, whatever the title may have been or may be.

Mr. Barton declares, upon the witness-stand, that the first knowledge he had of any defect in his title was information respecting a decision of the United States court in the case of *Scull* v. *United States, 8 Otto 410.* From looking into this case as it is reported, I am not apprised when the bill therein was filed, nor how long the suit was pending prior to its culmination and final determination in the supreme court of the United States. It must have been some time earlier than 1878 or 1879. It seems the proceedings in that case were instituted under the act, to which counsel has called my attention, approved June 22d, 1860. I desire especially to call attention to that fact. It struck me as very significant when counsel relied upon it in the argument touching the act for the settlement of private land claims within the territory referred to. I think it will not be disputed but that that act was notice to every person who had title, or claimed to have title, to any land within that entire region. It seems to me that he was brought directly within the purview of that act. Perhaps no stronger notice could be given to any citizen or subject than such a notice, and if he saw fit to trust his claim, or to trust his grantor, independently of the provisions of that act, he did it at his peril. From the time that act became a law, Mr. Barton was bound by it. Taking the act and the recital, so full and complete in his deeds of conveyance from Mr. Long, had he been at all attentive to his interests and his rights as against Mr. Long, at a glance he should have understood whether or not this act had any application to his case. I say that Mr. Barton, under all the rules of evidence and of construction, had notice of the Don Joseph Valliere grant, and of its general nature, its peculiar character, its vast indefiniteness. I do not know how else to express it—its absolute uncertainty. It seems to have been determined as to location, as to monuments and boundaries, by the imagination only, without any actual position, or tracing, or fixing of visible and known monuments.

And for the justness of these remarks with respect to the location of this land, I refer to the opinion of Mr. Justice Miller, in the case of *Scull* v. *United States*, which shows very conclusively from the testimony as it was there presented (and it is that upon which Mr. Scull relied as showing a defect in his title)—I say, it is there shown very conclusively that it was impossible to locate this Don Joseph Valliere grant.

Now, what has that to do with the case of Barton, may be inquired? Just as much as it had to do with the case of Scull. If Scull was warned at one time to proceed to establish his title under this act, and facts warranted him in supposing that his title might be defective, the act was a like notice to Mr. Barton, and the facts were like warnings to Mr. Barton. He knew that his title was in jeopardy. The inference, therefore, is, to my mind, most conclusive that, from the time of the passage of this act, Mr. Barton slept upon his rights. From 1860 until 1887, the time of the filing of this bill, over twenty-six years, he was indifferent about this matter. If there be no limitation fixed by that act, it must be remembered that he is not now proceeding under that act. He must be governed by the law of the forum in which he brings his suit.

The counsel made some observations respecting the consideration paid, saying that there was not a particle of proof to show that Mr. Long gave a penny for the title. If that is true, then, on the other hand, the defendants attempt to shield themselves upon a change of title to a *bona fide* purchaser—Mr. McCullough. But there is no proof that Mr. McCullough ever paid a cent. That may be so, but that does not settle the case, in my judgment, against the defendants, under the circumstances.

For, in addition, I cannot but be impressed with the consideration that this was a speculation between these parties. The one took the sand-flats upon the sea-shore of New Jersey (thirty years ago), which, by the action of the elements, the rise and fall of the tides and otherwise, might to-day have had as little certainty as to location as the Vallier grant; and for that Mr. Barton did not take two hundred and fourteen acres simply of the lands of Arkansas, but the undivided half of nearly nineteen

thousand acres, which was very much like the speculations in stocks and bonds and certificates of the present day in Third street and Wall street. So that it seems to me that the case upon this branch alone comes within the numerous decisions in which the courts refuse absolutely in many cases to aid speculators, and never aid them, unless their application for relief is very prompt indeed. *Cooper* v. *Carlisle, 2 C. E. Gr. 525; Paulison* v. *Van Iderstine, 1 Stew. Eq. 306; S. C., 2 Stew. Eq. 594; Walford* v. *Adie, 5 Hare 112, 117; Clegg* v. *Edmondson, 8 DeG., M. & G. 787, 808; Graham* v. *Birkenhead Co., 2 Macn. & G. 146; Peabody* v. *Flint, 6 Allen 52, 57.* I ask attention to *Wagner* v. *Baird, 7 How. (U. S.) 234, 258, 259; Bowman* v. *Wathen, 1 How. (U. S.) 189; Landsdale* v. *Smith, 16 Otto 391; Hudson* v. *Layton, 5 Harring. 74 (48 Am. Dec. 167*); *Johnson* v. *Toulmin, 18 Ala. 50 (52 Am. Dec. 212*); *Perkins* v. *Cartmell, 4 Harring. 270 (42 Am. Dec. 751, 757*); *Pugh* v. *Bell, 2 Mon. 125 (15 Am. Dec. 142*).

As I said in opening, I feel it my duty, especially towards the complainant, to hasten the expression of my views in this matter, that he may not be delayed, being warned, as I was, by counsel, of appeals from my former decision as to the admissibility of evidence having been taken, and that the appeals might be pressed together, so that, if possible, he might have but one expense in the hearing of the whole case.

My conclusions are, the bill should be dismissed, with costs.

———

By order of the court, these two appeals were argued together.

The first appeal brings up for review four orders of the court of chancery—three being rulings on the admission of evidence before the master, and one being an order disallowing complainant to amend his bill. The first order relates to the ten appeals from the rulings of the master; the second order relates to the appeal from the ruling of the master; the third order refuses the amendment of complainant's bill, undertaken by notice, and the fourth order relates to the appeal from the ruling of the master refusing

Burhans *v.* Hindle.

the admission in evidence of an exemplified copy of the record of *Scull* v. *United States.*

The second appeal to this court is from the final decree of the chancellor dismissing the bill.

The only opinions in the case are, as to the amendments of the bill, *supra p. 841;* as to the admission in evidence of the record of *Scull* v. *United States, supra p. 845,* and as to final hearing, *supra p. 846.*

This court has already held, in this case, that the final decree was taken by defendants at their risk, should complainant prevail in his first appeal. *Barton* v. *Long, 18 Stew. Eq. 160.*

*Messrs. Bergen & Bergen* and *Mr. George M. Robeson,* for the appellant.

*Messrs. Grey & Grey,* for respondent James Long.

*Mr. D. J. Pancoast,* for respondent M. S. McCullough.

PER CURIAM.

These orders and this decree unanimously affirmed.